## PYEATT *vs.* SPENCER.

Whether the evidence given in this case, established insanity, considered and dis. cussed.

THIS was an action of covenant, tried in the Washington Circuit Court, in May, 1842, before the Hon. JOSEPH M. HOGE, one of the circuit judges. Spencer, by his declaration, alleged that Pyeatt, on the 15th of June, 1839, by his covenant, under seal, for the consideration of $650, bargained, sold, and delivered to Spencer, a certain negro woman, slave for life, named Sophia, and warranted her to be sound and healthy, as far as he knew, and bound himself, his heirs, &c., to warrant and defend the right and title of the negro to Spencer, his heirs, &c., for ever; and alleging, as a breach, that the slave was not sound or healthy, when sold, but unsound, uhealthy, and mentally deranged, and that *Pyeatt well knew her to be so*, at the time of sale and delivery; so that the plaintiff had lost the money paid for her, and she had become of no value. The second count stated, in addition, that he had lost her services, and had paid out large sums of money for her board and keep, and in trying to have her cured.

The defendant demurred to the declaration, and his demurrer being overruled, he pleaded that the slave, when sold, was sound and healthy, as far as he knew, and that he did not well know her to be unsound and unhealthy. The plaintiff demurred to the plea, and his demurrer being overruled, he joined issue to it, and the case was tried by a jury. The jury found that the negro was unsound, when sold, and that Pyeatt knew it, and assessed the plaintiff's damages to the sum of $716; for which, and costs, judgment was rendered.

The evidence given on the trial, which is brought up by exceptions to the decision of the court, refusing a new trial, was, in substance, this: the bill of sale was correctly described in the declaration. A few days after Spencer bought the slave, he was found whipping her. He had her *stripped*, and *staked down* on the ground; her feet and hands extended, and fastened to stakes; and her face downwards.

Pyeatt *vs.* Spencer.

He appeared calm and deliberate, and was whipping her at intervals, using a cowhide, with a plaited buckskin lash about fifteen inches long. He asked her what made her do so, and she said that Bedford and Buchanan told her, that if she staid there, she would be whipped to death. The witness examined the negro, *and found her to look wild.* Spencer had drawn some blood, but not a great deal. *He took salt and a cob, and salted her back.* This witness stated that he thought her deranged. He had never seen her before, but has often seen her since, and she is deranged and valueless.

Another witness lived and worked at Pyeatt's, when he bought the slave, and while he kept her. He kept her about two months. She was a negro of vicious, bad disposition, but not deranged as far as the witness could know. He did not know why Pyeatt sold her. She was sent to the field, soon after Pyeatt got her, and worked in the field with witness. She frequently talked to herself, and would laugh without any one speaking to her, or being near her. Some time after Pyeatt sold the slave to Spencer, witness heard Pyeatt say, that if justice was to take place, Buchanan (of whom he bought the negro), ought to lose her.

Another witness, who knew the slave when she was a girl, stated that she was sound in mind, as far as he knew; and was considered an obedient, good house-servant. Witness never saw her but twice, after Pyeatt bought her. At one of the times, she had run away from Pyeatt, and witness found her in the wood, and took her home. She seemed obstinate, walked very slow, and when he threatened to whip her, or she feared she would be ridden against, she walked faster, and looked wild, as negroes usually do, when threatened. She said that she had run away because she wanted to go to her children. She was raised by witness' brother, who was a kind, indulgent master. She was at all times sound of mind, as far as witness could ascertain.

Another witness had seen the negro twice. She was obstinate and disagreeable, because she wanted to go to her children. She seemed much devoted to her children, and when her mistress gave her time, would make clothes, and knit for them. Witness staid a day at Pyeatt's, and she prepared and set the dinner. She was of sound mind, as far as he knew.

Another witness stated, that shortly before Buchanan sold the slave to Pyeatt, he brought her to witness' house, to sell her, and left her there, where she staid a week. She was sound of mind, as far as he could ascertain, but while she was there he went away, and did not return until she was gone. He saw her again, after Spencer had bought her, when she ran away, and came to witness' house. Spencaught her, and chained her. Witness then, for the first time, discovered that she was deranged. He again met her, in the fall of 1839, when she had run away from a person to whom Spencer had sold her. He afterwards saw her at another place, cutting wood. She told him she had started to go to her children.

Another witness stated, that in the summer or fall of 1841, he examined her, and believed her to be deranged. Derangement is produced from various causes. It might have been produced by severe whipping; but such whipping as was described in this case, would not produce it in one case in a thousand. Strong attachment for her children, and grief at being separated from them, with severe chastisement, would be more likely to produce it.

In the spring of 1840, Spencer tendered the slave to Pyeatt, who refused to take her back.

The defendant moved for a new trial, on the ground that the verdict was contrary to the evidence, and the instructions of the court; and also, on an affidavit, that he was surprised by the testimony of one witness, who would, on a new trial, modify his testimony so as to give it an aspect entirely different.

The motion being overruled, he embodied the testimony, excepted, and appealed.

*Pike & Baldwin,* for the appellant. There was not the slightest evidence that Pyeatt knew the negro to be insane, when he sold her, even if such were the case. He could not be made liable, unless he *knew* the defect; and, therefore, the issue was properly framed.

With respect to express warranties, all that can be reasonably required of the seller, is, that he be guilty of no deception, or unfairness, in the representations which he makes to the buyer. If the representation is *positive,* he is bound by it; but if he state that which he be-

*lieves* to be true, giving the purchaser at the same time to understand that he has no absolute knowledge on the subject, he is not bound, unless he knew of the defect. *Rans's Long,* 211; *Dunlap vs. Waugh,* Peake's Rep. 123; *Wood vs. Smith,* 5 *M. & R.* 124; *S. C.* 4 *C. & P.* 45.

If a seller of a horse says, "I never warrant, but he is sound, as far as I know," he is liable if he *knew* the unsoundness, but not otherwise. *Wood vs. Smith, ub. sup.*

A party may give either a general warranty, or a qualified warranty. By a general warranty, he warrants at all events. But it is qualified warranty, if he only warrants the animal sound, for all he knows. *Wood vs. Smith,* 4 *C. & P.* 45; *Case vs. Boughton,* 11 *Wend.* 106; *Whitney vs. Sutton,* 10 *Wend.* 441; *Cook vs. Mosely,* 13 *Wend.* 278.

To constitute a warranty, the representation must be one which the vendee relies on, *and which is understood by the parties as an absolute assertion,* and not the expression of an opinion. *Duffee vs. Mason,* 8 *Cowen,* 25; *Chapman vs. Murich,* 19 *J. R.* 290; *Swett vs. Colgate,* 20 *J. R.* 203; *Roberts vs. Morgan,* 2 *Cowen,* 138; *Oneida Man. Co. vs. Lawrence,* 4 *Cowen,* 442.

There was a total failure to prove that the slave was unsound, when Pyeatt sold and delivered her. The testimony is very strong that she was then sound; and it is very doubtful whether the inhuman punishment inflicted on her by Spencer, with other circumstances, did not cause the insanity, after she was bought by him.

In an action on a warranty, the plaintiff must prove, *clearly* and positively, the breach of it at the time of such warranty. The unsoundness must be proved to have existed *at the time of sale;* and it will not be enough to show that there was an *opinion,* merely, of unsoundness. If the evidence merely leaves it doubtful whether the property was unsound or not, at the time of sale, the plaintiff cannot recover. *Eaves vs. Dixon,* 2 *Taunt.* 343; *Myers vs. McFarlane,* 2 *Tr. Const. Rep.* 686; *Rouple vs. McCarty,* 1 *Bay.* 480.

Insanity is essentially a bodily disease, and moral causes operate in producing it, as they do in producing other complaints. Injuries to the head, fever, suppressed discharges and secretions, misfortunes,

gusts of violent passion, and the protracted indulgence of grief, terror, and sudden fright, may produce it. *Shelford*, 59, 60.

There was no sufficient evidence that the negro was insane, at all. No professional man was examined, nor were any facts stated to prove her insanity. The evidence simply amounted to a general statement, that she was insane. To what extent, or what way the disease developed itself, is not stated.

There are some states of the mind, which, though they resemble insanity, cannot be properly so called. Such are extreme absence and abstraction of thought, great peculiarity of actions or opinions, ungovernable impetuosity of temper, and unreasonable fears and timidity. *Shelford* 48.

There is no evidence as to what form the insanity assumed—whether it was melancholy, monomania, demency, or idiocy. Nor is there any evidence whether it was curable or not. For insanity is as curable as any other disease to which mankind are subject. It arises from deranged bodily functions, not mental affections; and may be removed by *kindness* and proper attention, though not by whipping and salting. *Shelford*, 73, 74, 75, *to* 83, *introduction.*

Insanity must be proved, by clear and unexceptionable evidence. *Particular acts of madness* must be given in evidence, and not general evidence that the party is insane. *Shelford*, 35, 36; *Clarke vs. Periam*, 2 *Atk.* 340; *People vs. Tripler, Wheeler Cr. Cas.* 49; *People vs. De Graff, id.* 203; *Dickinson vs. Barber*, 9 *Mass.* 225.

And its existence must be proved, not by one instance of unreasonable conduct, but by reiterated acts, and a multiplicity of actions; by the testimony of persons who have been attentive observers of them; for it is an *habitual* state or disposition, and a permanent affection of the mind. *Shelford*, 36.

There may be a partial insanity, as where the patient is merely under a delusion; or a total insanity, as where he is raving mad. *Shelford*, 40, 41, 42. There is no evidence as to the nature of the *derangement*, in this case.

The rule of evidence, in regard to insanity, is the same as in other cases. *Facts* must be stated to the jury, from which they may determine the question of insanity. The facts cannot be stated to medical

men, and their opinion taken as to whether they constitute insanity, or not. *Shelford,* 62; 1 *Dow. P. C.* 179; *Rex vs. Wright,* 1 *Russ. & Ry.* 456; *Dew vs. Clark,* 3 *Addams,* 79.

The medical man's evidence, in order to impress and satisfy the tribunal before which his testimony is given, *should not merely pronounce the party to be insane,* but ought to adduce sufficient reasons as the foundation of his opinion. He should have investigated, accurately, the collateral circumstances. *Shelford,* 71; *Haslam Med. Jur.* 48 *to* 51.

And if opinions as to insanity are stated, they must be given in connection with the facts on which they were formed. *Grant vs. Thompson,* 4 *Conn.* 203, 208. *Corlis vs. Little,* 1 *Green,* 232; *Crowell vs. Kirk,* 3 *Der.* 357.

*Fowler,* contra. An affidavit appears to have been marked filed, by the clerk, and is copied into the transcript, but the record neither shows that it was filed, or in any manner before the court; and the bill of exceptions precludes the inference that it was presented to the court below, for adjudication. It is but a loose memorandum of the clerk, or attorney, or party, and cannot be noticed by this court. *Lenox vs. Pike,* 2 *Ark.* 16, and authorities there referred to. *Coolidge vs. Inglee,* 13 *Mass.* 50; *Storer vs. White,* 7 *Mass.* 448; *Pierce vs. Adams,* 8 *Mass.* 383; *Goldbury vs. May,* 1 *Litt. Rep.* 254; *ib.* 166; 3 *Marsh.* 389; 1 *Hen. & Mun.* 376; 2 *Brock.* 75; *Col vs. Driskell,* 1 *Blackf.* 16; *Gist vs. Higgins,* 1 *Bibb R.* 304; 6 *Mass.* 323; *Bunis vs. Wise & Hand,* 2 *Ark.* 43; *Ballard et al, vs. Noaks, ib.* 57.

Although the evidence, as set out in the bill of exceptions, may not appear upon its face to be positively conclusive that the verdict is right, yet there being evidence tending to induce a verdict either way, the jury are the proper judges, and their verdict should not be disturbed. They are the constitutional and exclusive judges of the *manner* of testifying, the *language* of the witness, and of the *credibility, preponderance,* and *effect* of the evidence; and unless their verdict be *palpably* and *outrageously wrong,* the judge should never interfere, to set it aside, even though very clear, in his opinion, that he would not have found such a verdict. See *De Fonclear vs. Shottenkirk,* 3 *J.*

Pyeatt *vs.* Spencer.

R. 170. *Ward vs. Center, ib.* 281. *Long vs. Perry, Hardin* R. 317. *Taylor vs. Giger, ib.* 587. 3 *Bibb Rep.* 313. *Douglass vs. Tousey,* 2 *Wend.* 352. 4 *Hayw. Rep.* 204. *Gist vs. Higgins,* 1 *Bibb,* 304.

This court will not set aside a verdict, and award a new trial, merely on the ground that the jury found " contrary to the preponderance of testimony." *Howell vs. Webb,* 2 *Ark.* 364. *Casky vs. January, Hard. Rep.* 539. 2 *Wend.* 352. *Daniel vs. Prather, &c.* 1 *Bibb,* 480. 14 *Petersd. C. L.* 169.

To authorize a new trial, the verdict must not only be against the weight of evidence, but " so much so, that, on the first blush of it, it should shock our sense of justice and right." *ib. Hard. Rep.* 539. *Weisiger vs. Graham,* 3 *Bibb,* 313.

The power of granting a new trial, by the appellate court, " after it has been refused by the court before whom the cause was tried, ought to be very cautiously and circumspectly exercised." The revising court " cannot see the evidence in all its *minutiæ,* as it has appeared before that court." *Casky vs. January, Hard. Rep.* 539. *U. S. vs. Daniel,* 6 *Wheat.* 542. *Murray vs. Ruble,* 4 *Hayw.* R. 204. 1 *Bibb,* 304.

In *Wilkinson vs. Payne,* 4 *Durnf. & E.* 469, Lord *Kenyon* declared, and it was so determined, that " where there is something on which the jury have raised a presumption agreeably to the justice of the case, the court will not interfere by granting a new trial, where the objection does not lie in point of law."

The manner of giving testimony is important, and it is difficult, if not impossible, to transfer it into any written statement; and the refusal of an inferior court to grant a new trial, is entitled to weight, from the superior opportunity it has had of judging of the evidence. *Gist vs. Higgins,* 1 *Bibb,* 304. 4 *Hayw.* 204.

This court will not grant a new trial, where it has been refused by the inferior court, unless it clearly appears that they have erred in refusing it; " especially where it is moved for upon the suggestion that the verdict was contrary to evidence." *McKinney vs. McConnell,* 1 *Bibb,* 241.

If there be a contrariety of evidence, the court will not set aside the verdict, and grant a new trial, although the verdict may be against

72

the opinion and direction of the judge who tried it, unless it clearly appears that the jury have drawn an erroneous conclusion. 1 *Petersdorff,. C. L.* 169. *Ward.vs. Center,* 3 *J. R.* 281.

*By the Court,* DICKINSON, J. We have given the question the most deliberate investigation; and though, as a general rule, we are not disposed to interfere with the province of the jury, where there is contradictory evidence, yet, in the case before us, we are of opinion that the proof fails to establish the facts of insanity in regard to the slave, and therefore there is no liability resting upon the defendant. It is with. pain and sensibility, that the court feels itself constrained to remark, that whatever seeming wildness and aberration of mind might be perceived in the slave, it is but reasonable to suppose, was caused by grief, and the excessive cruelty of her owner.

Judgment reversed, and a trial *de novo* awarded.